Filed 3/15/22  P. v. Amurrio CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> FREDDY RONALD AMURRIO, <br><br> Defendant and Appellant. | B311742 <br><br> Los Angeles County <br> Super. Ct. No. VA057508 |

APPEAL from an order of the Superior Court of Los Angeles County, Lee W. Tsao, Judge. Reversed and remanded with instructions.

Ruben J. L. Salgado for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr. and Steven D. Matthews, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant Freddy Ronald Amurrio, a Bolivian national who lacks meaningful ties to his country of birth, has been a lawful resident of the United States since he was young. His three children are American citizens. In September 2000, Amurrio pled guilty to drunk driving and transportation of hallucinogenic mushrooms. He received probation. More than a decade later, while returning to the United States from a soccer tournament in Mexico, immigration authorities discovered the conviction and initiated removal proceedings against him.[1] In 2020, Amurrio filed a motion to vacate his conviction and withdraw his plea, arguing he did not understand that his guilty plea would subject him to mandatory deportation, and he would not have pled guilty if he had. The trial court denied the motion, and Amurrio appeals. We reverse the court's order and remand with directions.

## BACKGROUND

Amurrio was born on September 29, 1973, in Cochabamba, Bolivia. In 1985, Amurrio immigrated to the United States to join his parents, who at the time were lawful permanent residents.

---

[1] Amurrio also appears to have been convicted, in February 2000, of misdemeanor criminal threats (Pen. Code, § 422). The circumstances surrounding that conviction are not before us, and the People do not argue that the conviction renders Amurrio deportable or results in his inability to show prejudice from denial of the motion to vacate and withdraw his plea to the transportation and drunk driving charges. We therefore do not address it. (See *People v. Rodriguez* (2021) 68 Cal.App.5th 301, 306, fn. 4 (*Rodriguez*).)

Amurrio became a lawful permanent resident of the United States in 1987.

Amurrio attended and graduated from high school in Whittier, California. He has three children, born in 1997, 2000, and 2002, all of whom are American citizens.

By information dated July 25, 2000, Amurrio was charged with felony possession for sale of a controlled substance (psilocyn) (Health & Saf. Code, § 11378; count 1); felony transportation of a controlled substance (psilocyn) (Health & Saf. Code, § 11379, subd. (a); count 2); misdemeanor driving under the influence with prior (Veh. Code, § 23152, subd. (a); count 3); and misdemeanor driving with a blood alcohol content of 0.08 percent or higher with prior (Veh. Code, § 23152, subd. (b); count 4).

Amurrio was represented initially by a deputy public defender. Private counsel Laura Stone substituted into the case about three weeks after Amurrio was arraigned on the information.[2] On September 21, 2000, the date set for trial, Amurrio entered into a plea deal with the prosecution. He pled guilty to count 2, transportation of a controlled substance, and count 4, one of the misdemeanors. Amurrio initialed and signed a *Tahl* waiver form.[3] Box 10—one of the boxes Amurrio initialed— stated "I understand that if I am not a citizen of the United States, the conviction for the offense charged may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of

[2] As discussed below, Amurrio retained not Stone but attorney Bruce Margolin.

[3] See *In re Tahl* (1969) 1 Cal.3d 122. Most of the handwriting on the form appears to be Stone's.

the United States." Amurrio also checked "Other" under box 18, under which someone had written, "That it is in my best interest to plea [*sic*] to the counts listed above, pursuant to People v. West."[4] Amurrio did not check other sub-boxes under box 18, leaving "Factual basis" blank and not checking, "I am pleading guilty to take advantage of a plea bargain."

In response to the prosecutor's questions, Amurrio confirmed he understood the charges against him, had read and understood everything on the form, and had no questions "about anything on [the] form." The prosecutor told Amurrio, "If you're not a citizen you will be deported from the United States, excluded from admission back into the United States or denied naturalization." The prosecutor asked, "Do you understand that?" Amurrio responded, "Yes, I do." Amurrio then pled guilty to counts 2 and 4. Stone joined in the waivers and plea but did not stipulate to a factual basis. The court (Judge Philip H. Hickok) accepted the plea and ordered Amurrio to return for sentencing on November 1, 2000.

Amurrio returned as ordered on November 1. A different bench officer—Judge Robert J. Higa—was presiding.[5] In accordance with the plea agreement, Judge Higa sentenced Amurrio to the midterm of three years in state prison on the felony, suspended execution of that sentence, and placed him on formal probation for three years on standard terms and conditions including that he serve 25 days in county jail.[6]

---

[4] See *People v. West* (1970) 3 Cal.3d 595.

[5] Amurrio agreed Judge Higa could sentence him.

[6] Before sentencing Amurrio, Judge Higa confirmed with the parties that the agreement was Amurrio would be sentenced to state prison

During the next few years, Amurrio violated probation twice and was incarcerated at least once on a bench warrant. Eventually, the court terminated probation in September 2004.

In 2011, Amurrio was granted sole custody of his children. The following year, he took his son to Mexico for a children's soccer tournament. When he attempted to reenter the United States, however, he was detained by immigration authorities based on his 2000 conviction. In 2013, the Department of Homeland Security issued a Notice to Appear for removal proceedings.

On November 2, 2020, Amurrio moved to vacate his conviction and withdraw his guilty plea under Penal Code sections 1473.3, 1473.7, and 1016.5,[7] arguing that he did not understand that his plea would subject him to mandatory deportation.[8] Amurrio submitted a declaration stating that, even though Stone knew he was an immigrant from Bolivia, "she never asked [him] about [his] immigration status in the United States." Amurrio declared he met Stone once at her office and twice at the

---

but execution of that sentence would be suspended. However, the minute order of the November 1, 2000 proceedings erroneously states, "Imposition of sentence suspended." Generally, the court's oral pronouncement controls if there's a discrepancy between it and the minutes. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)

[7] All undesignated statutory references are to the Penal Code.

[8] It's unclear whether Amurrio's motion was directed at both the felony count and the misdemeanor count. On pages 7, 17, and 41 of his motion, Amurrio seems to be talking only about the felony charge. But the declaration he submitted from an immigration attorney stated Amurrio sought to vacate his conviction on the misdemeanor count as well.

courthouse.[9] On the date of his plea, he met her "only moments before," and she told him to plead guilty "immediately." She "never informed [him] of the specifics as to what [he] was pleading guilty to with respect to immigration, and did not advise [him] of any specific immigration consequences that could or would stem from pleading guilty."

Amurrio declared he did not know or understand that the plea would cause him to lose his green card and be deported. Had he been told that, he "would never have pleaded guilty" and "would have fought to the end." Amurrio stated he had been prejudiced by his plea "because [he] was placed in deportation proceedings in federal court to be deported on the grounds that [he had] been convicted of a felony offense involving a controlled substance."

Among other exhibits, Amurrio attached copies of notices to appear he had received from the Department of Homeland Security. A notice dated July 22, 2012, lists the conviction for transportation of psilocyn as well as a June 1997 arrest for possession of marijuana for sale, resulting in a misdemeanor conviction, and a September 1999 arrest for criminal threats, resulting in a misdemeanor conviction and probation. A February 21, 2013 notice omits any reference to the 1997 marijuana case and notes a February 2000 misdemeanor conviction for criminal threats (presumably resulting from the September 1999 arrest).

Amurrio submitted a declaration from Kiran Nair, the attorney representing him in the removal proceedings. Nair stated that an argument was presented to the immigration judge

---

[9] Amurrio was out on bail at the time of his plea.

that Amurrio's conviction should not be classified as an "aggravated felony" or "drug trafficking offense" because it predates 2014, but the judge "may not agree with [Nair], and it is likely that Mr. Amurrio will be found to be ineligible for discretionary relief"; he then would face deportation to Bolivia "and banishment for life from the United States."

In late February 2021, Amurrio filed additional exhibits, including a declaration from Bruce Margolin. Margolin declared on information and belief that he'd been retained to represent Amurrio. Margolin stated he had no file 20 years later, he "never appeared in court with [Amurrio]," and he had no "specific recollection of any conversations that [he] may have had with Mr. Amurrio."

Amurrio also submitted a declaration from Laura Stone dated February 23, 2021.[10] Stone declared she did "not recall the specific details of Mr. Amurrio's case" but could see from the court documents that she "did represent Mr. Amurrio in this matter." Stone stated she was "making an appearance for Bruce Margolin," who was Amurrio's retained counsel. Stone declared, "I do not have a specific recollection of the conversation that I had with Mr. Amurrio on September 21, 2000, the day of his guilty plea." Stone continued, "As a rule I tell non U.S. Citizen defendants that they should consult with an immigration

---

[10] An investigator for Amurrio's counsel tried on February 12, 2021, to serve Stone with a subpoena to appear on March 11, 2021, and bring her client file. The receptionist at Stone's office said she wasn't there, "stated in a rude manner" she would not "accept [any] documents," and told the investigator she was going to throw the subpoena he'd laid on the counter as well as his business card in the trash.

attorney as I am not an immigration attorney and I have never practiced immigration law."

The prosecution filed a written opposition to Amurrio's motion. The record on appeal does not include that written opposition. At the hearing on March 11, 2021, Amurrio's counsel and the prosecutor told the court they had no other evidence to present and would not be calling witnesses.

After hearing at length from counsel, the court denied Amurrio's motion. The court called Stone's declaration "troubling," and it found Stone "did not properly advise Mr. Amurrio of his immigration consequences." But, the court continued, "even if Mr. Amurrio was unaware of the immigration consequences of the plea, the contemporaneous evidence we have shows that he would have pled guilty anyway to avoid a longer sentence and, hence, he was not prejudiced." The court said the case was "difficult" and "unusual" because it "settled right before trial for a time-served offer." In the court's view, however, Amurrio chose "to avoid [the] adverse consequences" of a lengthy sentence that he knew was "going to occur if he should go to trial" at the risk of immigration consequences, which the court characterized as "somewhat uncertain." The court noted in conclusion that, "if [it were] reversed in this matter," it would "truly be happy for [Amurrio] and [his] family." But, the court said, it was "sworn to uphold the law as [it] understood it."

Amurrio filed a timely notice of appeal.

## DISCUSSION

Section 1473.7, subdivision (a)(1), provides that a person who is no longer in criminal custody may file a motion to vacate a conviction or sentence on the basis "[t]he conviction or sentence is legally invalid due to prejudicial error damaging the moving

8

party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea of guilty or nolo contendere. A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel." (See *Rodriguez*, *supra*, 68 Cal.App.5th at pp. 308, 310; *People v. Rodriguez* (2021) 60 Cal.App.5th 995, 1002.) "A successful section 1473.7 motion requires a showing, by a preponderance of the evidence, of a *prejudicial* error that affected the defendant's ability to meaningfully understand the actual or potential immigration consequences of a plea." (*People v. Vivar* (2021) 11 Cal.5th 510, 517 (*Vivar*); see § 1473.7, subd. (e)(1) ["The court shall grant the motion to vacate the conviction or sentence if the moving party establishes, by a preponderance of the evidence, the existence of any of the grounds for relief specified in subdivision (a)."].)

"What someone seeking to withdraw a plea under section 1473.7 must show is more than merely an error 'damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences' of the plea. [Citation.] The error must also be 'prejudicial.' " (*Vivar*, *supra*, 11 Cal.5th at p. 528.) "[S]howing prejudicial error under section 1473.7, subdivision (a)(1) means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences." (*Id.* at p. 529; accord, *People v. Rodriguez*, *supra*, 60 Cal.App.5th at p. 1003 ["A defendant requesting relief under section 1473.7 bears the burden of establishing by a preponderance of evidence that there is a reasonable probability that he or she would not have entered into the plea agreement if

9

he or she had meaningfully understood the associated adverse immigration consequences."].)

"When courts assess whether a petitioner has shown that reasonable probability, they consider the totality of the circumstances. [Citation.] Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible." (*Vivar*, *supra*, 11 Cal.5th at pp. 529–530; see *People v. Mejia* (2019) 36 Cal.App.5th 859, 866 [" 'The key to the statute is the mindset of the defendant and what he or she understood—or didn't understand—at the time the plea was taken … .' "].) "[W]hen a defendant seeks to withdraw a plea based on inadequate advisement of immigration consequences, we have long required the defendant corroborate such assertions with ' "objective evidence." ' " (*Vivar*, at p. 530.)

"[W]e review … rulings [under section 1473.7] independently." (*Vivar*, *supra*, 11 Cal.5th at p. 524; accord, *People v. Lopez* (2021) 66 Cal.App.5th 561, 574 ["a motion to withdraw a plea under section 1473.7 is reviewed independently rather than for abuse of discretion"].) Under this standard, " 'an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law.' " (*Vivar*, at p. 527.) "Independent review extends particular deference to trial court findings 'that are based on " 'the credibility of witnesses the [superior court] heard and observed' " ' but not to findings drawn from the 'cold record' in the proceeding, since the trial and appellate courts are in the same position when tasked with interpreting such

10

materials." (*People v. Alatorre* (2021) 70 Cal.App.5th 747, 755 (*Alatorre*); *Vivar*, at p. 527.)

In this case, Amurrio established it was reasonably probable he would not have pled guilty to the charges had he meaningfully understood the associated immigration consequences. As noted, although Amurrio hired private counsel, Bruce Margolin, there's no indication Margolin ever met or spoke with Amurrio before Amurrio entered his plea. Instead, Margolin handed the case off to Stone. And Stone submitted a declaration admitting that she knew nothing about immigration law. Amurrio also stated under oath in his declaration that Stone knew he was from Bolivia but never asked about his legal status or "advise[d] [him] of any specific immigration consequences that could or would stem from pleading guilty." That testimony is unrebutted.

To be sure, Amurrio signed the *Tahl* waiver form with an immigration advisement and stated he had no questions about anything on the form. And, before entering his plea, Amurrio was informed by the prosecutor that if Amurrio was not a citizen he "will be deported from the United States, excluded from admission …, or denied naturalization." Amurrio's failure to ask additional questions about the immigration consequences of his plea is not fatal to his motion, however. Amurrio had come to the United States in 1985, when he was young, to join his parents, who were lawful permanent residents. Then, in 1987, he became a lawful permanent resident himself and obtained a green card. Amurrio declared he had "always thought that being a Lawful Permanent Resident gave [him] security," and "[i]t just never occurred to [him]" that his plea would cause him to be deported. The fact that Amurrio had traveled to Mexico for his son's soccer

11

tournament years later is circumstantial evidence that he had no reason to fear exclusion from admission to the United States. (See *Alatorre*, *supra*, 70 Cal.App.5th at pp. 752, 770 [fact that defendant tried to become naturalized citizen showed he didn't know his plea had made him deportable; "[i]t goes without saying that someone who understood his criminal conviction made him automatically deportable would not voluntarily contact immigration authorities and advise them of his presence in the country"].) In short, Amurrio has shown by a preponderance of the evidence that he did not "meaningfully understand" or "knowingly accept the actual or potential adverse immigration consequences" of his plea. (§ 1473.7, subd. (a)(1).)

Prejudice is a closer question. "[T]he statute doesn't itself define what 'prejudicial' means." (*Vivar*, *supra*, 11 Cal.5th at p. 528.) But our Supreme Court has concluded "showing prejudicial error under section 1473.7, subdivision (a)(1,) means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences." (*Id.* at p. 529.)

The contemporaneous evidence corroborates Amurrio's contention that there was a reasonable probability he would have rejected the plea deal had he meaningfully understood its immigration consequences. As Amurrio notes, the probation officer—in recommending probation—wrote that Amurrio was "working and caring for his family." Having "close ties to the U.S." is an "important factor of a type frequently highlighted by appellate courts" that "weigh[s] heavily" in a movant's favor. (*Alatorre*, *supra*, 70 Cal.App.5th at p. 769.)

Indeed, Amurrio's ties to the United States are similar to those considered by the Supreme Court in *Vivar*. For example:

12

(1) Vivar, a lawful resident noncitizen of the United States who faced permanent deportation for a 2002 drug conviction under former Health and Safety Code section 11383 (*Vivar*, *supra*, 11 Cal.5th at pp. 516–517), was brought to the United States at a very young age (*id.* at p. 516 [age 6]), just as Amurrio, a lawful permanent resident who faces removal for a decades-old drug offense, was brought here when he was 13 to reunite with his parents; (2) Vivar's family lived legally in the United States (*id.* at p. 517), just like Amurrio's family, which, as of 2000, included his mother, father, brother, two children, and his extended family; (3) Vivar grew up in the United States and attended schools here (*id.* at pp. 517–518), just like Amurrio, who graduated from high school in Whittier; (4) Vivar had been in the United States for decades (*id.* at p. 520), just like Amurrio had, at the time of his plea, been in California for 15 years; and (5) Vivar, like Amurrio, indicated that he lacked meaningful ties to the country of his birth (*id.* at p. 516).

Several other published cases have also found prejudice where the defendant—like Amurrio—had lived in this country for many years and had extensive family ties in the United States. (See, e.g., *Rodriguez*, *supra*, 68 Cal.App.5th at pp. 324–325 [finding prejudice where the defendant was brought to the United States as an infant, had lived here for 22 years along with her parents and children, attended schools in the United States, and lacked meaningful ties to her birth country]; *People v. Camacho* (2019) 32 Cal.App.5th 998, 1101–1102 [finding prejudice where the defendant was brought to the United States as a child, had lived here for over 30 years, and his spouse and children were citizens]; see also *People v. Espinoza* (2018) 27 Cal.App.5th 908, 917 ["Because defendant resided in the United States since he

was four years old as a lawful permanent residen[t], his family resided in the United States, and he was employed as a maintenance supervisor at a Holiday Inn, it could be reasonably probable that defendant would have rejected any plea that would have mandated deportation"]; *People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 73 [movant's declaration indicated he would have rejected plea deal, having moved across the globe and established his life in the United States]; accord, *Lee v. United States* (2017) 582 U.S. __ [137 S.Ct. 1958, 1968] (*Lee*) [finding prejudice where the defendant was brought to the United States as a child, had lived here for nearly 30 years, and his parents were citizens]; compare *People v. Bravo* (2021) 69 Cal.App.5th 1063, 1069, 1076–1077, review granted Dec. 15 2021, S271782 [no prejudice where defendant entered the United States at age 18, had only been in the country for four years at the time of his plea, was not a lawful permanent resident, and did not mention his relationship with either his girlfriend or his son in his declaration].)

The Attorney General asserts Amurrio "received a good plea bargain" with "favorable terms." We don't share that view. Amurrio had no felony convictions; his criminal record consisted of two misdemeanors. Accordingly, in a case like this (not involving violence, a weapon, or a large quantity of narcotics), he almost certainly would have been granted probation. While he was able to avoid custody time beyond the 17 actual days he'd spent in jail before posting bail, a prison sentence of three years was a high price to pay for that avoidance, even though its execution was suspended. In the very unlikely event Amurrio had been denied probation upon conviction, and sentenced to state prison, the low term of two years would have been the court's

14

likely choice.[11] It's certainly possible that—had he understood the potentially dire immigration consequences—Amurrio would have opted for two years of custody time rather than permanent exclusion from the United States. (See *People v. Espinoza* (2018) 27 Cal.App.5th 908, 917 ["The probability of obtaining a more favorable result at trial is one factor to consider in evaluating prejudice, but it is not necessarily the determinative factor."]; *Lee*, *supra*, 137 S.Ct. 1958 [it could be reasonably probable that a defendant would have rejected any plea leading to deportation—even if it shaved off prison time—in favor of throwing a "Hail Mary" at trial, where avoiding deportation was *the* determinative factor for the defendant]; *People v. Ogunmowo*, *supra*, 23 Cal.App.5th at p. 79 [even though defendant's declaration didn't "flush[ ] out the likelihood of success at trial," he "nonetheless established prejudice without [this] factor[ ]"; his declaration "ma[de] clear that he wanted to avoid deportation at all costs"].)

The Attorney General also argues Amurrio " 'fails to identify any "immigration-neutral disposition to which the prosecutor was reasonably likely to agree." ' " But, as we have discussed, because Stone was apparently oblivious to the issue of Amurrio's immigration status, she never explored any possible disposition on a different charge. (See *Alatorre*, *supra*, 70

---

[11] Amurrio also faced up to a year of jail time for the misdemeanor count, but it was very unlikely the court would have run that sentence consecutively to the felony. Although the Attorney General says the "good plea bargain" included the "dismissal of two counts", those dismissals would have had no practical effect. Counts 1 and 2, and counts 3 and 4, respectively, were essentially alternative charges. Accordingly, any sentence on those duplicative counts would have been stayed under section 654.

Cal.App.5th at pp. 770–771 [though there was "little in the record to establish [defendant's] priorities in discussing a plea deal with his defense counsel," "part of his claim [was] that he spoke infrequently with his defense attorney and that another attorney actually communicated the prosecutor's offer to him"].)

In sum, considering the totality of the circumstances and the evidence from Amurrio's perspective, we find it reasonably probable that if he had understood the likely immigration consequences of his plea, he would have either pressed for an immigration-neutral deal, if possible, or taken his case to trial. His deep ties to the United States provide contemporaneous evidence that avoiding deportation would have been a paramount concern had he truly understood his situation. Amurrio appears to be in the class of defendants who would risk additional prison time in exchange for holding onto some chance of avoiding deportation. (*Lee*, *supra*, 137 S.Ct. at pp. 1961–1962; *Alatorre*, *supra*, 70 Cal.App.5th at p. 771.) He thus has carried his burden and is entitled to relief.

16

## DISPOSITION

The order denying Amurrio's motion to vacate his conviction and withdraw his guilty plea is reversed and the matter is remanded with directions to grant the motion. (See *People v. Camacho*, *supra*, 32 Cal.App.5th at p. 1012 ["The appropriate remedy is to direct the trial court to grant the motion"].)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

EGERTON, J.